All right, we have Mr. Tucker and I believe Dana Camilleri is going to be on audio only. Are you there? Yes, I'm here, Your Honor. All right, thank you very much. Then let's proceed. Mr. Tucker. Good morning, Your Honors, and may it please the Court. I want to address at least two points today. First, the vagueness of the moral turpitude statute. And second, the petty offense exception. If there's time, hopefully I'll also get to why Ms. Zaragoza's conviction did not involve moral turpitude. The crime involving moral turpitude statute, which is 8 U.S.C. Section 1182, is unconstitutionally vague for the same reasons that led the Supreme Court in Johnson, DiMaia, and again in Davis to declare very similar statutes unconstitutionally vague. The phrase moral turpitude itself has no determinate meaning, and the interpretive gloss that the Board of Immigration Appeals has placed on it, this categorical approach, doesn't really clarify anything more than it clarified in these prior cases. In the Supreme Court's 1951 It's the concept of a crime that is, you know, immoral inherently, has been with us as a concept for centuries, right? And your argument seems to suggest that this crime involving moral turpitude is inherently vague, but that would also be the case of crimes that are considered inherently immoral under that ancient common law concept. Well, there's really two parts to it. It is, one, the phrase moral turpitude, which I think, as you kind of mentioned, it goes towards maybe this concept of malum in se, but it's also, you know, going back to Johnson, DiMaia, and Davis again, it's not just the phrase and the text itself. Because determining whether a statute is vague necessarily involves looking to how the text of the statute has been interpreted. And here, the Board authoritatively interpreted this statute to require the categorical approach in 2016 in a case called matter of Silva Trevino. And that looks to whether the minimum conduct that stands a realistic probability of being prosecuted under the state criminal statute involves moral turpitude. That part of this, this categorical approach, is what the Supreme Court very clearly set out in Johnson, guesswork and estimation that the Constitution doesn't allow under principles of due process and separation of powers. Well, actually, the whole Johnson line of vagueness cases doesn't rest solely on a categorical approach, because it causes a lot of headaches and difficulty of line drawing. But that whole line of Supreme Court cases, just based on the difficulty of applying the categorical approach, it was the categorical approach, plus the risk analysis that was inherent in the residual clause text. We have a statute that criminalizes the confinement, intentional confinement of a child, cruel confinement of a child, in a way that causes harm. Well, Your Honor, to respond to that, the Indiana statute doesn't actually require any harm, only that it's only that by the state court. I'm sorry, we've been talking over each other. It's the internet connection. Go ahead. I apologize. Yes. The Indiana courts like Hartberger, Scruggs, these other cases that we cite in our briefs, there's sort of two aspects to how conduct fits within the statute. First, there's an intentional or knowing act by a parent or a guardian of some sort. And then separately, second, that the conduct that they intentionally engaged in, and then putting aside the list of harms that the Indiana cases have set out, judged from an objective standard. And so, in one of the lowest thresholds, there is mental distress. So, this Indiana statute that we're talking about, that Ms. Zaragoza was convicted under, it reaches any parent who basically does something knowingly. And then also, at the same time, you can objectively say that was likely to cause mental distress. And at the same time, the way these cases, Hartberger, Scruggs, et cetera, have described the harm, they explicitly carve out that you don't have to endanger the dependent's life or health. So, there's really a very low threshold for what this statute captures. It's exposing the child to that danger that is captured within the definition of cruel confinement under the state statute, as I understand the state court's ruling. Yeah, that's right, Your Honor. The distinction I'm making is a separation between the intentional or knowing requirement of the statute and the harm that's required. If you look at a case like matter of civil tribunal, a case that we cite pretty extensively in our briefs, in that case, there was a real direct connection in the way the Board of Immigration Appeals described the conduct that had to knowingly, and that involves sexual relations with a minor, so it was that you knew you were having sexual relations with a minor. But here, this Indiana divorced those two from a direct connection. And it's separating the intent from the harm. And this exact same distinction has led other circuits to conclude that very similar child endangerment statutes that did not involve moral turpitude. That's the result in the Fifth Circuit in a case called Rodriguez-Castro, and also in the Third Circuit in a case called Hernandez-Cruz. And taking a look more specifically at Hernandez-Cruz, that involved Texas' child endangerment statute, which, just like this statute, contained the words intentional. But even so, the Fifth Circuit pointed out that the statute still reached conduct only really involving negligence and temporary leaving a child with the intent to return in a situation of unreasonable risk, kind of like what you said, Your Honor, but without actual harm to the child ever occurring. And so that description of Texas' child endangerment statute very easily describes Indiana's neglect of a dependent statute here. And so we think the same result is warranted. Your Honor, returning to the vagueness issue and focusing on the Supreme Court's 1951 decision in Jordan v. DeGeorge, that case does not control here. And what sets this case apart from Jordan is the categorical approach. Determining whether a statute is vague necessarily involves looking to how the text of the statute has been interpreted. And the Board authoritatively interpreted the statute, like I said, in 2016. Jordan did not consider in any way whether this categorical approach is vague. So Jordan does not control here. And to be really clear, our argument is that Jordan simply doesn't speak to the relevant legal framework applied here, not that this Court must overturn Jordan in any way. The government's approach to Jordan in this case is inconsistent. The Board, when the Board considered this case, it concluded that Ms. Zaragoza's conviction involved moral turpitude based on the categorical approach to the phrase crime involving moral turpitude. That is not the same interpretation and approach to the phrase crime involving moral turpitude that the Supreme Court applied and upheld in Jordan, which only looked to whether fraud was an essential ingredient. So it's fundamentally unfair to conclude here that Ms. Zaragoza should be removed from the country based on one interpretation of this phrase for matter of Silva Trevino addressing the merits, but then separately sort of defend the constitutionality of a very different interpretation of the phrase from Jordan. Your Honors, I'd like to turn next to the petty offense exception. Ms. Zaragoza must qualify her for the petty offense exception to removal in this case really one way or another. If, as the government has argued, the definition of a term of imprisonment from 8 U.S.C. section 1101 is ambiguous and the Attorney General's interpretation is therefore entitled to deference, as the government has argued, then this new interpretation creating new adverse immigration consequences for Ms. Zaragoza cannot be given retroactive effect. As the Board previously concluded in matter of Cote de Vargas in 2005, the text of 8 U.S.C. section 1101A48 subparagraph B, which tells courts how to calculate the term of imprisonment, requires the Board to give effect to sentence modifications. The text says that sentence suspensions and non-executed sentences should be disregarded when calculating the term of imprisonment. So Congress gave clear instructions here as to what it wants judges to ignore for that purpose. So having addressed these very specific circumstances, Congress's silence with respect to sentence modifications must be read to mean only sentence suspensions and non-executed sentences should be disregarded. There is no ambiguity in this statute that would allow, that would open the door for the Attorney General to read sentence modifications into the text, and what the Attorney General said in matter of Thomas is the wrong way to read this statute. The real difference between the way we read the statute and the way the government reads it is that we read the statute based on its text and the government very much tracking with what the Attorney General said in matter of Thomas reads the statute based on its belief about Congress's intent. But the Attorney General's stated belief that Congress intended the original sentence to govern is wrong for a few reasons. To the extent that Congress intended the original order to govern, that can only be true for the definition of a conviction from Paragraph A. And interpreting Paragraph A to focus on the original order may be consistent with the text of that paragraph because there Congress instructed courts to ignore deferred adjudications. But we have not argued in this case that Ms. Zaragoza was not convicted for purposes of Paragraph A. We simply argue that the term, that her term of imprisonment of less than 180 days based on her modified sentence, and there is no similar basis in the text of Paragraph B to focus on her original sentence when calculating the term of imprisonment. The Attorney General saying that Congress must have intended for the original sentence to control is also seriously undermined by the approach taken in cases like Ramirez. These cases say that when a parole revocation leads to a longer sentence, the longer original sentence to control, that can't be true only when the original sentence is longer. But the reality is that nothing in the text of Paragraph B says to disregard a sentence modification, so it must be considered when calculating the term of imprisonment, regardless of whether it stems from a parole revocation or something else. Is this, Mr. Tucker, an argument about whether the Attorney General's interpretation of the statutory scheme in the Thomas case is a reasonable interpretation? So the parties agree here that the statute doesn't speak to the issue of whether the original sentence controls or whether the modified sentence controls, that it's ambiguous, and so we're at Chevron, that's true, right? I'm just trying to there is no Chevron deference that would allow the Attorney General to read sentence modifications into the text of this statute. Our argument is that Paragraph B, the silence with respect to sentence modifications doesn't create any ambiguity here. The statute is clear and specific about how to calculate the term of imprisonment. It does not say anything about disregarding a our argument is that there is no ambiguity here. The statute says what it says and that ends it. And it's important to point out that sentence suspensions in non-executed sentences are certainly different from sentence modifications. We know that at least the Indiana court that modified Ms. Zaragoza's sentence thought of them as different because not only did it modify her suspended the modified sentence as it did in the original order as well, so the Indiana court certainly thought of these two things as different. And generally speaking, courts, most courts don't think of these things as the same. A sentence suspension in non-executed sentences is a very practical matter, permitted defendant to avoid actually spending time in prison, but the order imposing the sentence remains a valid and lawful order. But an order modifying a sentence like Ms. Zaragoza's in the modified order becomes the only valid and lawful order here. But if this court does adopt the Attorney General's reading of the statute, then at the very least, this new reading should not be applied retroactively. At the time Ms. Zaragoza sought a sentence modification, the board's decision in matter of Cota Vargas held that the modification would be given immigration effect and nothing in the statute or in the Attorney General's decision in matter of time state an intent for this new rule to apply retroactively. But I do see I'm going into my rebuttal time, and so I will reserve the rest of my time. Actually, you've used all of your time, but I'll give you some time added on for rebuttal. Ms. Camilleri. Good morning. May it please the court, this is Dana Camilleri for the Attorney General. Zaragoza's conviction for neglect of a dependent categorically constituted a crime involving moral turpitude. Zaragoza has not pointed to any case, her own or otherwise, that shows a realistic probability of non-turpitudinous conduct being punished under the statute. Furthermore, the agency properly applied the Attorney General's decision in matter of Thomas and Thompson to the instant case in finding that Zaragoza's subsequent sentence modification did not alter the immigration consequences of her conviction. Finally, the Supreme Court's decision in Jordan v. George remains controlling law. Accordingly, the court should reject the void for vagueness arguments raised by petitioner and the consolidated petitions for review should be denied. Just looking at in terms of the realistic probability test, in petitioner's reply brief, he focused on successful prosecution in order to try to make a distinction between the two cases that were vacated on direct appeal. And I just want to note that in Duenas-Alvarez, the Supreme Court, in discussing realistic probability tests, said that a person like petitioner, quote, must at least point to his own case or other cases in which the state courts, in fact, did apply the statute in a special non-generic manner for which he argues. That being said, everybody agrees that the two cases that he relies on, or that petitioner relies on, they were vacated by the state courts. And there's no other case where the conviction was not vacated that didn't involve morally turpitude in its conduct. In terms of Zaragoza's own case. But Ms. Camilleri, does that matter? Yes. This is Judge Sainib. Does that matter when the focus of the realistic probability test is on being prosecuted as opposed to an ultimately successful conviction? Well, Your Honor, our argument is that that's actually not what the focus is, and that the Supreme Court was discussing how state courts were applying the law. And here, the state courts clearly were applying the law, found that that was not conduct, that it should be punished under the statute, and vacated those two convictions. And that happened before Zaragoza was ever charged. And there are no successful cases that were not vacated on direct appeal that involved non-morally turpitude in its conduct. And in fact, Petitioner's Counsel, I think, understated the harm or the risk of harm to the child, sort of waved away mental distress. But certainly, the two cases that were vacated did involve some negligence on the part of the parent. And the court, the Indiana Appellate Court, in no uncertain terms, said that that was not sufficient to support a conviction under the statute. So in many ways, those cases actually support our position, which is that no conviction under the statute would stand unless it involved morally turpitude in its conduct, such as what we see here. So in our view, she just has not met the realistic probability test. The discussion and attempt to distinguish the case from matter of leal are really unavailing. Matter of leal is sort of analogous. It did require a reckless mens rea, and there was a higher culpability in the instant case in terms of intentionally and knowingly abandoning or cruelly confining your child, which is a special protected class of person. It requires a dependent and a special relationship, and you know that they may come to harm as a result of your actions. So in our view, this is really categorically a CIMT. Turning to matter of Thomas and Thompson, the plain language argument fails, as Your Honor pointed out, because there is nothing addressing sentence modifications in the statute. If it were, then they would have been addressed. There is ambiguity in the statute concerning term of imprisonment, and the AG has been those terms that have been inserted into the INS. And in our view, Thomas and Thompson is entitled to deference and was a reasonable interpretation of term of imprisonment, effectively using the framework developed in Pickering for convictions and applying it in this context, which this court has endorsed Pickering on numerous occasions and also applied Pickering, found that it could apply retroactively to cases where the alien had an appeal pending before the board, before Pickering was issued. Ms. Kammeler, you do not address the five retroactivity factors set forth in Velazquez-Garcia. Is it your position that that analysis doesn't apply here? Or why aren't those addressed in your briefing? Well, Your Honor, it's our position, the way that we read Velazquez-Garcia, is that those factors were a non-exhaustive list. I think the court and the panel said that right at the beginning. And we do feel that even taking into account those factors, they have not made a case for that retroactive application would be wrong. They argue that they could have... That doesn't mean we can totally disregard them, does it? Because you didn't address them at all. All right, Your Honor. For example, one of the factors is whether or not the new rule represents an abrupt departure from well-established practice. I think even you would agree that Thomas is an abrupt departure from a well-established practice. So is it your position that we should ignore that? Or that that is just one factor, and looking at the other factors, it tips the scale? Well, we think it's just one factor. I thought I did address some of this in my brief, but my apologies. Their argument for retroactivity is that they relied on the rule and therefore didn't seek some sort of substantive vacature of the conviction. And that's one of the arguments, because that's one of the factors under Velazquez-Garcia. Right, but it Exactly, but it doesn't make sense, because if you had a substantive basis for vacating your conviction, you would seek out and do that. And really, it's basically not disputed that the sentence modification was expressly done for immigration purposes, so that there could be one less day to try to take advantage of this loophole. But wasn't that the practice? Isn't that what a lot of other individuals in the same position had been doing up until this time? Yes, some people were taking advantage of the situation that way. And that's really illustrated by Thomas and Thompson, two individuals who were convicted of the same crime and received different categories of sentence modifications, one of whom would be removable and the other who wasn't. And the Attorney General is simply trying to create uniformity in the way immigration laws are applied in these cases. And that is also a factor that Velazquez-Garcia discusses as being incredibly important. The problem I have with reliance in this context on the retroactivity analysis is that it's difficult to apply those concepts of reliance interests in the criminal context. Courts are normally reluctant to say that reliance interests attach when it comes to crimes of moral turpitude, crimes Malamud say, that people who are committing those crimes rely on the ability to get away with it, for lack of a better way to put it, in committing the crimes. That would be a moral hazard in the law, and we don't normally recognize those sorts of moral hazards and give them effect in law. And the other problem is that to the extent that the point is being raised that the plea negotiation calculus would be different normally a court would be reluctant to say that plea negotiations depend on the ability to undo the plea negotiation and change the bargain down the road by sashaying into court and getting a judge to sign off on a modified sentence for purposes of altering immigration consequences. That would distort the incentives pretty significantly. But again, this is something that it would have been helpful to have some discussion in the briefs about, which we didn't get. So maybe you could address that now. Well, yes. And, you know, she, with the sentence modification. Birth incentives and to shorthand it. Well, that's why the attorney general closed this loophole, because people were going in and the sentences for parole, probation period has already been served and going in and retroactively changing it to be one day short of whatever the immigration consequences are. There's a case in circuit that they just rejected. The California legislature's attempt to do something like that with misdemeanors to side the bar. And it does create a bad incentive. And it also it's a legal fiction. She was sentenced. The immigration consequences attached at the time she was convicted. And now, you know, many years later in in Sconston, removal proceedings, she goes back and and tries to get one day left after all the terms of her conviction have already been fulfilled. And so, yes, it does create bad incentives. And it doesn't it doesn't really make sense because it's changing something that has already occurred, that has already been fulfilled. And just simply to come in here. And as I noted in our brief, the circuit has rejected a sentence modification that was patently for immigration purposes before a matter of Thomas and Thompson. And Andrade Zamora finding that it shouldn't change the immigration consequences. And we argue that that is the situation here. All right. Is there anything further? I'm not hearing other questions from the court. I know you can't see us. No, I'm sorry. My Internet went out this morning. I did not plan to appear via phone. Do you have anything else for us? No, there are no more questions for me. I will rest on my brief. All right. Thank you very much, Mr. Tucker. Your time had expired, but you may have two minutes for a rebuttal to answer some of the questions that were during your opponent's time. I think you must be still muted because we can't hear you. Yes. Thank you, Your Honor. Yeah. Thank you for picking that up. And thank you for the rebuttal time. I'd like to talk about retroactivity, as you were discussing with opposing counsel. This wasn't a loophole, an attempt to sort of exploit something in the law or a loophole. Indiana's sentence modification statute doesn't bar like a plea bargain, a case where there's a plea bargain from there eventually being a sentence modification. And she sought a sentence modification to more accurately reflect the seriousness of her conduct. Now, she was, of course, motivated to have her sentence more accurately reflect her conduct because of the immigration consequences that she was not aware of at the time she pleaded guilty and received her original sentence. But to put some more perspective on what happened here, the entirety of her original sentence was suspended. 30 days were served at home by electronic monitoring. Without any real awareness of the immigration consequences, she had little reason to care about the length of the sentence because she was not going to jail regardless. In addressing her reliance at the time she sought a sentence modification, she no doubt relied on the prior law from Cote d'Ivore that was explicitly changed in matter of times. The point of reference would be at the time she committed the crime or perhaps the time she entered into the plea negotiation and entered into the plea, not when she sought the modification. Were there reliance interests on the state of play of the sentence modifications at the time she committed the crime? Probably not, right? Well, there were definitely reliance interests. Sorry, I'm cutting off. I don't mean to do that. Let's focus on the time of the plea. Well, at the time of the plea, she was relying on the fact that she didn't think there was any immigration consequences that were going to flow from this. That was the reliance there. And then you fast forward, if I can quickly just talk about her reliance interests at the time of the sentence modification. She actually could have sought to overturn her conviction on that basis that she was not advised of the immigration consequences. Maybe for other reasons as well, like Harberger and Scruggs were very similar convictions were overturned on appeal. But that would have required more expense, more time, an attorney. And the law at the time didn't require this. So she relied on that fact. And now to her detriment, the matter of Thomas is applied retroactively. But thank you, your honors. I ask that you grant the petition and remand to the board. Thanks very much. And thanks to both counsel and the cases taken under advice.